UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
Seth Naugler, *et al.*,

                    Plaintiffs,

     - against -

Air Line Pilots Association, International,
and Duane E. Woerth, *in his official capacity*,

                    Defendants.
-------------------------------------------------------x

OPINION & ORDER
05 CV 4751 (NG) (VVP)

GERSHON, United States District Judge:

       Plaintiffs are U.S. Airways, Inc. ("US Airways") pilots who agreed to work for MidAtlantic Airways ("MidAtlantic" or "MDA"), a division of the US Airways mainline operation. Defendant Air Line Pilots Association International ("ALPA") is an unincorporated labor union that served as the exclusive collective bargaining representative for all the US Airways pilots, including plaintiffs, during all times relevant to this case. Defendant Duane E. Woerth was the President of ALPA and is named in his official capacity.

       After all counts in their First Amended Complaint were dismissed, plaintiffs filed a Supplemental Complaint, with leave of court, stating a single claim for breach of the duty of fair representation ("DFR") against ALPA and Mr. Woerth, alleging that ALPA knew of, and stipulated to, the introduction of an erroneous, previously corrected seniority list during arbitration proceedings regarding the integration of pilot seniority lists when US Airways merged with America West Airlines, Inc. ("America West").

       Now before the court is defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking to have the Supplemental Complaint dismissed with

prejudice.  For the reasons stated below, defendants' motion is granted.

## FACTS

Unless otherwise indicated, the following facts are undisputed.

### A. Background

Plaintiffs are pilots who flew Embraer-170 aircraft for MidAtlantic Airways, a division of US Airways, from 2004, when MidAtlantic launched until 2006, when MidAtlantic operations ceased.  At the time they flew for MidAtlantic, some of the plaintiffs had been furloughed from their positions at US Airways.  Others had flown only for wholly-owned subsidiaries of US Airways.

ALPA is a labor union that represents pilots who fly commercial aircraft at approximately 37 airlines in the United States and Canada.  At each airline, ALPA acts through a Master Executive Council ("MEC") that is comprised of pilots from the represented airline and serves as the coordinating council for union membership at that airline.  At all relevant times, ALPA served as the exclusive bargaining representative for all pilots at US Airways, including furloughed pilots and those at wholly owned subsidiaries, through the US Airways MEC.  Defendant Duane E. Woerth is the former President of ALPA and held that office until he was succeeded by Captain John Prater on January 1, 2007.  Since April 2008, pilots at US Airways have been represented by the U.S. Airline Pilots Association ("USAPA").

US Airways, like many of the other large airlines, experienced serious financial difficulties in the period subsequent to the terrorist attacks of September 11, 2001.  In September 2001, alone, the airline lost $7.52 per share and its debt rating was downgraded by both Moody's and Standard & Poor's.  In August 2002, US Airways applied for bankruptcy protection, from which it exited in March 2003.  In September 2004, less than 18 months after its first exit from bankruptcy, the airline applied for bankruptcy protection for a second time.  When it exited its second bankruptcy

approximately one year later, US Airways merged with America West, a low-cost air carrier. The merger was announced on May 19, 2005 and closed on September 27, 2005, the day US Airways emerged from its second bankruptcy.

Prior to filing its first bankruptcy petition, US Airways and ALPA entered into the "2002 Restructuring Agreement" (or the "2002 Agreement"). That agreement contained wage, benefit, work-rule and other concessions and also authorized US Airways to operate a carrier to be known as MidAtlantic. The US Airways MEC agreed to the 2002 Restructuring Agreement on July 13, 2002, and it was ratified by US Airways pilots on August 11, 2002.

Though the parties agree that US Airways initially intended to operate MDA as a wholly-owned subsidiary, ALPA and US Airways agreed in the 2002 Restructuring Agreement that MDA could operate *either* as a new wholly-owned subsidiary of US Airways or as a separate division of US Airways. The parties agree that the 2002 Agreement lacked clarity as to the classification of MDA as either a division, or as a wholly-owned subsidiary.[1] But it is undisputed that, despite the uncertainty of MDA's status during negotiations over working conditions and compensation, MDA ultimately flew on US Airways' operating certificate as a division of US Airways, not as a wholly-owned subsidiary.

It is also undisputed that the rights of the pilots who were to fly for MDA were initially defined in the 2002 Restructuring Agreement and refined by subsequent additional agreements. Based on US Airways' financial realities, ALPA agreed to allow MDA to operate under terms and conditions of employment different from those of the mainline operation. The 2002 Restructuring

---

[1] For example, when the 2002 Agreement spoke of the Placement of Small Jets, there were three categories, one for "Participating Wholly-Owned Carrier[s]," which is defined as "a carrier wholly owned by US Airways Group, Inc., *other than MDA* (emphasis added);" a second for "Participating Affiliate Carrier[s]," which is defined as "a carrier . . . *other than a Participating Wholly-Owned Carrier or MDA* (emphasis added);" and a third category for MDA, defined simply as Mid-Atlantic Airways. *See* 2002 Restructuring Agreement, p. 6.

Agreement provided that "[a]ll MDA positions will be filled first by US Airways Pilots." *See* 2002 Restructuring Agreement, Attachment B, pp. 7-8. If additional pilots were needed, MDA could hire pilots from US Airways' wholly-owned subsidiaries and, as a last resort, pilots from outside US Airways. US Airways was to use the Affected Pilot List ("APL") to determine which pilots were on furlough and the Combined Eligibility List ("CEL") to determine which pilots were available from US Airways' wholly-owned subsidiaries. A furloughed pilot could decline an offer of employment at MDA without losing his place on the APL; in other words, the order of seniority on the APL would not be affected by a pilot's choice to accept or decline work at MDA. *See* 2002 Restructuring Agreement, Attachment B, p.8, Bullet Point Four (A pilot "may bypass an offer of employment with MDA without losing his position on the Affected Pilot List, regardless of his preference.").

Subsequent Letters of Agreement ("LOAs") modified the 2002 Restructuring Agreement. LOA 84, approved by US Airways and ALPA on December 13, 2002, stated that US Airways could operate MDA "as a separate division within the mainline - U.S. Airways, Inc. with such operation limited to Large SJ's."[2] At the time of LOA 84, MDA's status, as either a division of US Airways or a US Airways wholly-owned subsidiary, had not yet been determined. Either way, it was to be operated under a separate work and benefits agreement. In other words, MDA's status and the status of its pilots were not to be governed by a conventional label, but rather by the conditions laid out in both the 2002 Agreement and in LOA 84.

---

[2] A small jet, or SJ, was categorized as small, medium or large based upon the number of seats it contained. MDA's aircraft, such as the Embraer 170 jets (E-170's), were called "Large SJ's," or large small jets. Aircraft larger than a Large SJ could be operated only by the mainline. Large SJ's are defined in the 2002 Restructuring Agreement to include E-170's. *See* 2002 Restructuring Agreement, Attachment B. Large SJ's "will be placed only at Mid-Atlantic Airways." 2002 Restructuring Agreement, Attachment B, p. 7. MDA could also fly medium and small SJ's. *Id.*

-4-

LOA 84 went on to explain that, "[a] pilot may accept voluntary furlough in lieu of displacement to a Large SJ position . . . and a pilot on furlough may bypass *recall* to a Large SJ position; in either case, the pilot will then be offered *recall* when his seniority entitles him to a position on an aircraft larger than a Large SJ." LOA 84 (emphasis added).  Although this sentence uses the word "recall" twice, based upon the undisputed documentary evidence, it is clear that a pilot who was *"recall[ed] to a Large SJ position"* was not *"recall[ed]"* to the mainline.  Therefore, a furloughed US Airways pilot who was offered and accepted a position at MDA, would still have to wait his turn, in the order listed on the APL, to be *recalled* to fly on the mainline.

In the fall of 2003, MDA began preparations to hire and train pilots by compiling training materials, including operating manuals.  In April 2004, MDA began hiring pilots, by extending offers of employment to pilots furloughed from US Airways in order of their seniority.  Pilots received letters on MDA letterhead offering them positions at "MidAtlantic Airways, a division of US Airways, Inc."  These MDA offer letters did not state that the offers of employment constituted recall to the mainline.  Pilots offered positions at MDA also received letters from Frank Blazina, MDA's chief pilot, who welcomed the pilots to "MidAtlantic Airways, a Division of US Airways."  Some furloughed US Airways pilots accepted positions at MDA, while others declined outright or worked at MDA for a short period of time before leaving.  After offers of employment at MDA had been extended to all furloughed mainline pilots, there remained open positions which MDA looked to fill by extending offers of employment to pilots from US Airways' wholly-owned subsidiaries.

Plaintiffs rely on these offer letters from MDA to bolster their contention that an offer of employment at MDA was a recall to the mainline, but those letters are insufficient to create an issue of fact supporting plaintiffs' contention.  The U.S. Airways Pilots Working Agreement (the "Working Agreement") between ALPA and US Airways fixed a procedure by which US Airways

recalled furloughed pilots to the mainline. There is no dispute that such procedures were not used when offering the furloughed mainline pilots employment at MDA. According to the terms of the Working Agreement, recall letters had to be sent to the pilots via "Reply - Requested Telegram" or "Certified Letter - Return Receipt Requested," and the MDA offer letters were not sent by either method. US Airways pilots were required to respond to letters of recall to the mainline within seven days, yet there was no seven-day limitation on response time specified in the MDA offer letters. And, unlike the letter furloughed pilots received recalling them to fly on the mainline, none of the MDA offer letters used the word recall or referenced the provisions of the Working Agreement which explained recall procedures. Significantly, except under certain conditions enumerated in the Working Agreement, a furloughed pilot who refused recall to US Airways lost his place on the seniority list, while furloughed pilots who elected not to accept employment at MDA did not lose seniority standing. In sum, not only did the procedure of recall differ from an offer of employment at MDA, but there were different consequences for declining recall to the mainline and declining an offer of employment by MDA.

**B. ALPA's Merger Policy**

At the time the merger was announced, ALPA represented both US Airways pilots and America West pilots. ALPA had an established policy governing how to integrate pilot seniority lists of two airlines which both employed ALPA-represented pilots. A Merger Committee was appointed by each MEC, one for US Airways pilots and one for America West pilots, and each MEC had the authority to represent its pilots with respect to integrating the seniority lists of the two airlines. In order to start the integration process, a Policy Initiation Date was chosen, which was the date when it appeared reasonably likely that a merger would occur. The Merger Committees selected a three member Arbitration Board to decide how the seniority lists were integrated in the event that

the Merger Committees would be unable to agree on a methodology of integration.  Two members of the Arbitration Board were pilot neutrals; each was a non-voting ALPA member chosen by one airline's Merger Committee.  The third member of the Arbitration Board was the Chairman, chosen from a list of arbitrators maintained by ALPA.  George Nicolau was chosen to be the Chairman of the Arbitration Board.  The US Airways Merger Committee selected Captain James Brucia as its pilot neutral and, as its pilot neutral, the America West Merger Committee selected Captain Stephen Gillen.

The Merger Committees compiled and determined the relevant employment data, such as dates of birth, dates of hire, furlough time and leave of absence time, for their respective pilots.  The list compiled by each Merger Committee is referred to as that airline's Certified Seniority List (the "List").  Each Merger Committee sent a certified letter containing employment data to each pilot whose data had not been previously verified or updated, meaning those who were hired at a date subsequent to the last time the Merger Committee verified pilot data, or those who had a change in status, such as a furlough or leave of absence, since the last time their data was verified.  In this case, the US Airways Merger Committee's letters were dated December 6, 2005 and, for pilots who had flown or were actively flying for MDA, listed their data including, start and end dates for furlough from the mainline and MDA start and end dates.  The letter also informed each recipient of the ALPA policy that, if a pilot disagreed with his own employment data, he may protest that data in writing and request a hearing before the Merger Committee.  Some pilots responded to the letter in writing, and objected to listing separate MDA start and end dates rather than just listing a US Airways furlough end date as the date they started flying for MDA; these pilots took the position that flying for MDA constituted a recall to the mainline, which ended their furlough.

When the Merger Committee received an employment data protest, it reviewed the protest

and determined whether the protest was correct or not, and it responded to the protesting pilot in writing. By letter dated January 24, 2006, the Merger Committee responded to the pilots who protested their employment data on the ground that flight for MDA constituted a recall to the mainline, explaining that the information contained in the letters of December 6, 2005, was correct.[3]

Once all the employment data for an airline was verified, and all protests resolved, the Merger Committee compiled a certified Flight Deck Crew Member Seniority List that reflected the proper seniority order of the pilots at the airline. Then, the Merger Committees of the airlines exchanged their respective seniority lists. The Merger Committees then proceeded through a three step process in an attempt to come to an agreement on a single, integrated list: (1) direct negotiations; (2) if unsuccessful, mediation; and (3) if mediation unsuccessful, binding arbitration. If 100 days passed without success in direct negotiation or mediation, the process proceeded to binding arbitration. Here, ALPA merger policy dictated that steps two and three, the mediation and arbitration, were to be presided over by the same person, George Nicolau, who, as mentioned above, was chosen as the Chairman of the Arbitration Board.

Upon the failure of direct negotiations and mediation, the Arbitration Board met with the Merger Committees to specify the scope of the evidence to be presented at arbitration and establish a hearing schedule and procedural rules for the arbitration proceeding. Then, the Merger Committees and their legal counsel presented their respective cases to the Arbitration Board. When the arbitration concluded, the Chairman convened an Executive Session of the Arbitration Board, and an Opinion and Award integrating the seniority lists was issued.

_____

[3] The letters in response to the pilot protests in the record stated that, "there are no errors in the employment data we previously sent to you. That data is shown below. We explained in our letter transmitting your individual employment data that we are separately noting the date of your employment at the MDA division of US Airways (as defined by the terms of the US Airways Pilots' Collective Bargaining Agreement) and we noted the date of recall from furlough to the mainline division of US Airways, if any."

## C. The May 19, 2005 Certified Seniority List

The US Airways Merger Committee generated its Certified Seniority List as of May 19, 2005, the day on which the two airlines announced their intent to merge. The List was comprised of three categories of pilots: (1) active pilots flying for the mainline; (2) pilots who were furloughed from the mainline; and (3) those combined eligibility pilots who flew for MDA but had never flown for the mainline.

The Certified Seniority List contained a legend on the first page which defined abbreviations used and gave equations for how certain time periods on the List were calculated. There was a column for each pilot's tenure at the airline. Tenure, or TEN, was defined as the number of years from a pilot's DOH, date of hire, until May 19, 2005. The Certified Seniority List also had a column for LOS, or length of service, which was equal to DOH less furlough time, but included a pilot's flying time for MDA, so that pilots were credited for their time at MDA in the LOS column. MDA was defined as time on the E-170 at the MidAtlantic Division of US Airways.

In order to list furlough time, as required by ALPA's merger policy, the US Airways Merger Committee included the following columns on the Certified Seniority List: Furlough Start 1; Furlough End 1; Furlough Start 2; Furlough End 2. Any pilot who was furloughed had a date listed in the Furlough Start 1 column. If a pilot had been furloughed, but was no longer furloughed, there were dates listed in both the Furlough Start 1 column and the Furlough End 1 column. If a pilot had been furloughed twice, then there would be additional dates listed in the Furlough Start 2 column and, if applicable, the Furlough End 2 column. In addition to the aforementioned columns, pilots who were on furlough as of May 19, 2005, but were not flying for MDA, had the abbreviation FUR, for furloughed, placed next to their names in the STS (status) column on the Certified Seniority List.

Pilots who were furloughed from the mainline but flying for MDA did not have an FUR

placed in the status column next to their names. However, those pilots had a date listed in a Furlough Start column and no date listed in a Furlough End column. They also had dates listed in the MDA Start column and, if applicable, MDA End column. So, a pilot who was flying for MDA had a date listed in a Furlough Start column in addition to a date listed in the MDA Start column. It is undisputed that such a pilot was understood to be furloughed on the Certified Seniority List, even though not labeled as furloughed in the status column.

## D. The Mediation and Arbitration

At the outset of the mediation, the US Airways Merger Committee proposed a "date-of-hire" integration so that the pilots of the two airlines would be merged according to the date they had been hired at their respective airlines. Mediation was unsuccessful, and the issue of how to integrate the seniority lists proceeded to arbitration. During arbitration, the US Airways Merger Committee advocated for integration based upon a length of service period. Arbitration hearings were held over several months beginning in late 2006 and ending in early 2007. At arbitration, the US Airways Merger Committee advocated that the merged list reflect that US Airways pilots had much longer lengths of service than America West pilots. The US Airways Merger Committee sought to have the Arbitration Board recognize MDA pilots' flight time as part of their length of service at US Airways and also proposed that the integrated seniority list be based upon employment data as of July 1, 2006, by which point US Airways had started to recall pilots from furlough to fly for the mainline, rather than May 19, 2005.

On May 1, 2007, the Arbitration Board issued its Opinion and Award (the "Award") authored by Chairman Nicolau, which decided how to integrate the seniority lists of US Airways and America West. The Award took into account each Merger Committee's arguments with respect to the differences in the composition of the pilot groups and their lengths of service at their respective

-10-

airlines, the nature of flying done by each airline and the relative financial health of each airline. The Award rejected the US Airways Merger Committee's length of service proposal and its position that the Award be based upon pilot seniority as of July 1, 2006. The Award also rejected America West's integration proposal, what it called a top to bottom active pilot ratio, which would have integrated the pilots from the two airlines proportionately, despite any difference in length of service.

The Award determined that, at the time of the merger, US Airways had 5098 pilots on its seniority list, of whom 1691 were on furlough from the mainline. The Award placed the 423 most senior pilots, all from US Airways, at the top; furloughed pilots, all from US Airways, were placed at the bottom; and all other US Airways and America West pilots were placed in the same relative position in the middle, despite the fact that America West pilots were decades younger and less experienced. The Award discounted the longer lengths of service of the US Airways pilots in light of their diminished career expectations, based upon the poor financial health of US Airways – evidenced by its multiple bankruptcies in a short period of time – as of the date the merger was announced. It placed the furloughed US Airways pilots below all active America West pilots because "merging active pilots with furloughees, despite length of service of some of the latter, is not at all fair or equitable under any of the stated criteria." May 1, 2007 Arbitration Opinion and Award, p. 28. The Arbitration Board, relying on the May 19, 2005 Certified Seniority List in making its decision as to how to integrate the pilots of the two airlines, determined that US Airways mainline pilots who had been furloughed but had then flown for MDA remained furloughed from US Airways and that the CEL pilots would be included on the integrated seniority list, despite America West's objections that they should not be included on the List at all because they had never flown for the mainline.

**E. US Airways Pilots' Efforts to Block Implementation of the Award**

Unhappy with the Award, US Airways pilots sought to block its implementation. They asked ALPA's president for a hearing before ALPA's Executive Council, which was granted. The Executive Council determined that ALPA's merger policy had been properly followed and that the Award should be implemented. Upset by this outcome, US Airways pilots voted to decertify ALPA, and, in April 2008, replaced it with USAPA, whose constitution advocates a date-of-hire seniority integration.

To date, the Award has not been implemented, and, despite the merger, the two airlines remain separate with respect to their pilot operations. America West pilots have sued USAPA to implement the Award in the District of Arizona. The District Court held a jury trial where USAPA was found to have breached its DFR by taking actions solely benefitting US Airways pilots at the expense of America West pilots. *Addington v. U.S. Airline Pilots Ass'n,* No. CV-18-1633, 2009 WL 2169164 (D.Ariz. July 17, 2009). The District Court rejected USAPA's argument that the claim was not ripe for judicial review. *Id.* The Court of Appeals for the Ninth Circuit, in a two to one decision, reversed and remanded the case for dismissal finding it was not ripe for judicial review. *Addington v. U.S. Airline Pilots Ass'n,* 606 F.3d 1174 (9th Cir. 2010), *cert. denied* 131 S.Ct. 908 (2011).

## PROCEDURAL BACKGROUND

Plaintiffs commenced this action on October 7, 2005 against ALPA, Duane E. Woerth, in his official capacity as President of ALPA, U.S. Airways, U.S. Airways Group, Inc., America West Airlines, Inc., Republic Airways Holdings, Inc. ("Republic") and Wexford Capital LLC ("Wexford"). All defendants except ALPA and Woerth were dismissed. No. 05-CV-4751, Doc. 21, July 11, 2006.

On July 6, 2006, plaintiffs filed their First Amended Complaint against ALPA and Woerth alleging that defendants' conduct breached their duty of fair representation under the Railway Labor

-12-

Act, 45 U.S.C. §§ 151-188, and violated the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961-1968. On January 22, 2007, defendants filed a motion to dismiss plaintiffs' First Amended Complaint in its entirety under Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that all but one of the duty of fair representation claims were time-barred and that all of the claims failed to state a claim for relief. On October 13, 2007, plaintiffs filed a motion for leave to file a supplemental complaint.

In an opinion and order of March 27, 2008, I granted defendants' motion to dismiss and also granted leave to plaintiffs to file their supplemental complaint. *Naugler v. Air Line Pilots Ass'n Intern.*, 05-CV-4751, 2008 WL 857057 (E.D.N.Y. Mar. 27, 2008). In granting leave to plaintiffs to file a supplemental complaint, I explained that, "[t]he alleged breach [of the DFR in the Supplemental Complaint] is not about the process or terms of the arbitration award . . . but that the union knew of, and stipulated to, the introduction of an erroneous, previously-corrected seniority list during the arbitration proceedings." *Id. at* *14.

Plaintiffs subsequently filed their Supplemental Complaint on April 18, 2008. The Supplemental Complaint alleges a single claim that defendants breached their DFR by submitting an allegedly erroneous seniority list to the Arbitration Board. The error, which plaintiffs assert defendants knew at the time of the submission, was that the List did not describe pilots flying for MidAtlantic as pilots flying for the mainline. Specifically, with respect to the pilots who had been furloughed from the mainline and had then chosen to fly for MDA, plaintiffs argue that their employment for MDA should have been treated as ending their furloughs. At the close of discovery, defendants filed this motion for summary judgment seeking to dismiss the Supplemental Complaint on three grounds: (1) that it is time-barred because the statute of limitations began to run more than six months prior to plaintiffs seeking leave to file the Supplemental Complaint; (2) that the issue in

-13-

the Supplemental Complaint is not ripe for adjudication; and (3) that the List submitted to the arbitrators was factually correct and therefore defendants did not breach their DFR.

## DISCUSSION

### I. Summary Judgment Standard

Motions for summary judgment are granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995). The moving party must demonstrate the absence of any material factual issue genuinely in dispute. *Id.* The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). Nor may the non-moving party "rest upon the mere allegations or denials of his pleading." Fed. R. Civ. P. 56(e). Rather, the non-moving party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–252 (1986) (stating that the "mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find [for the non-moving party]").

### II. Statute of Limitations

The statute of limitations for a breach of the duty of fair representation claim is six months. *See DelCostello v. Int'l Broth. of Teamsters*, 462 U.S. 151, 170-72 (1983); *Eatz v. DME Unit of Local Union Np. 3 of the Int'l Broth. of Elec. Workers, AFL-CIO*, 794 F.2d 29, 33 (2d Cir. 1986).

In cases where union members have sued their union for a breach of the duty of fair representation, the Second Circuit has long held that "the cause of action accrue[s] no later than the time when plaintiffs knew or reasonably should have known that . . . a breach ha[s] occurred." *Santos v. District Council of New York City*, 619 F.2d 963, 969 (2d Cir. 1980); *Ramey v. District 141, Int'l Assoc. of Machinists & Aerospace Workers*, 378 F.3d 269, 278 (2d Cir. 2004). Plaintiffs' motion to file the Supplemental Complaint was timely, as it was filed within six months of the date of the arbitration decision issued by Chairman Nicolau of the ALPA Arbitration Board. Plaintiffs could not reasonably have known which exhibits were submitted by the union to the Arbitration Board or whether the Arbitration Board relied on those exhibits to plaintiffs' detriment until the Board's decision was handed down, which occurred on May 1, 2007. Therefore, the date of the Arbitration Board's decision is the date from which the statute of limitations for this DFR claim started to run. The Supplemental Complaint, which plaintiffs sought leave of the court to file on October 13, 2007, less than six months from the date of the Arbitration Board's decision, is therefore timely.

## III. Ripeness

Defendants' argument that this case is not ripe for decision is rejected for the reasons stated on the record at oral argument on January 6, 2012. *See TRW Inc. v. Andrews*, 534 U.S. 19, 34 n. 6 (2001); *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997).

## IV. Duty of Fair Representation

The duty of fair representation, although not an explicit statutory requirement, has been fashioned judicially as a corollary to "the exclusive agent's statutory authority to represent all members of a designated unit" and requires a union "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and

honesty, and to avoid arbitrary conduct." *See Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65,

76-77 (1991); *Vaca v. Sipes*, 386 U.S. 171, 177 (1967).  A union, as the exclusive bargaining

representative of the employees it represents, owes the employees a duty to represent them fairly in

collective bargaining with the employer and in enforcing the resulting collective bargaining

agreement. *See Vaca*, 386 U.S. at 177; *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 201-02 (1944).

"A union breaches its duty of fair representation when its conduct toward a member of the

bargaining unit is arbitrary, discriminatory, or in bad faith." *Marquez v. Screen Actors Guild*, 525

U.S. 33, 44 (1998).  A union's actions are considered arbitrary if, "in light of the factual and legal

landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of

reasonableness' . . . as to be irrational." *O'Neill*, 499 U.S. at 67 (*quoting Ford Motor Co. v.

Huffman*, 345 U.S. 330, 338 (1953)).  It is not enough that a union made a bad or less than optimal

decision; its action must be "without a rational basis or explanation." *Marquez*, 525 U.S. at 46.  To

be discriminatory, the union's conduct must be "intentional, severe, and unrelated to legitimate union

objectives," as in the case of invidious discrimination based on race or gender. *Amalgamated Ass'n

of St. Elec. Ry. & Motor Coach Employees v. Lockridge*, 403 U.S. 274, 301 (1971).  A union acts

in bad faith when it acts with "improper intent, purpose, or motive." *Spellacy v. Airline Pilots

Ass'n-Int'l*, 156 F.3d 120, 126 (2d Cir. 1998).  Bad faith can be demonstrated by "substantial

evidence of fraud, deceitful action or dishonest conduct." *Amalgamated*, 403 U.S. at 299 (*quoting

Humphrey v. Moore*, 375 U.S. 335, 348 (1964)) (internal quotation marks omitted).  Establishing

that the union's actions were "arbitrary, discriminatory, or in bad faith" is "only the first step toward

proving a fair representation claim," as the plaintiffs "must then demonstrate a causal connection

between the union's wrongful conduct and their injuries." *Spellacy*, 156 F.3d at 126.

Defendants argue that they did not breach their duty of fair representation because the

-16-

seniority list submitted to the arbitrators was factually accurate. Plaintiffs argue that the defendants breached their duty of fair representation by submitting a seniority list which erroneously placed plaintiffs at the bottom of the seniority list amongst other furloughed pilots and first officers by listing no furlough end date for them, but rather including their start and, if applicable, end dates with MDA, which, in effect, categorized them as remaining on furlough. According to plaintiffs, there was no need to list an MDA start date because each pilot's MDA start date should have been his furlough end date; in short, plaintiffs argue, flying for MDA constituted recall to the mainline. Plaintiffs assert that the List had the effect of not properly crediting their flight time at MDA as flight for the mainline and erroneously placed them at the bottom of the List.

Plaintiffs claim that, because MDA was flying on the mainline operating certificate as a division of the mainline, a recall to MDA was necessarily a recall to the mainline. Defendants, on the other hand, contend that, although MDA was a division of the mainline, there were separate agreements which governed working conditions at MDA and that, based on those separate agreements, the offer and acceptance of a position at MDA was not a recall to the mainline.

As explained above, flying for MDA was not the same as flying for the mainline, despite the fact that there was ambiguity as to MDA's corporate status at U.S. Airways. The undisputed record establishes that there were different working and employment conditions for pilots flying for MDA, governed by the 2002 Restructuring Agreement and LOA 84. Flight for MDA was not flight for the mainline. Most significantly, acceptance or rejection of employment at MDA did not affect a US Airways' pilot's seniority standing. In contrast, except in limited circumstances, a furloughed US Airways pilot who refused recall to US Airways lost his place on the seniority list.

Further supporting this distinction is that a job offer to fly for MDA was not a notice of recall to the mainline. As described in detail above, the process by which MDA extended its job offers did

-17-

not follow prescribed recall procedures.  Letters offering employment positions at MDA did not mention the word recall or refer to any section in the Working Agreement which governed recall. The offer letters were not sent via "Reply - Requested Telegram" or "Certified Letter - Return Receipt Requested," and there was no mention in those offers of employment of the seven-day response period that applied to recall.  Thus, accepting a job offer from MDA was not a recall to flight for the mainline.  It was simply an acceptance of a job offer to fly for MidAtlantic Airways.

Since the List correctly identified the relevant employment data and the status of each pilot, the List submitted by ALPA to the Arbitration Board was factually accurate.  No breach of the DFR could occur from submitting the accurate List.  ALPA's actions in submitting the factually accurate List were not arbitrary because it was reasonable and rational to submit the accurate List.  *O'Neill*, 499 U.S. at 67.

Plaintiffs fail to show any way in which ALPA's conduct could be considered discriminatory. Not treating MDA pilots identically to mainline pilots, based on existing agreements setting the terms of employment, does not constitute discrimination.  "Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees . . . [t]he complete satisfaction of all who are represented is hardly to be expected." *Ford*, 345 U.S. at 338.

Finally, ALPA's submission of the factually accurate List to the Arbitration Board, prepared in accordance with its merger policy, was not in bad faith.  Each pilot was given the opportunity to review his seniority information and appeal it both in writing and in person by having a hearing before the Merger Committee.  Plaintiffs have offered no evidence of fraud, deceit or dishonesty with regard to any of the information contained in the List.  *Id.*, at 299.  That ALPA did not label the plaintiffs as furloughed in the status column on the Certified Seniority List was meant to help the

plaintiffs' position during the arbitration process and ultimately did help, as plaintiffs were credited with length of service time for their employment at MDA, even though everyone understood they were on furlough.

In sum, based on the undisputed facts, by submitting the accurate List, the union's conduct was not arbitrary, discriminatory, or in bad faith, and it did not breach its duty of fair representation. Since the defendants' conduct did not breach their DFR the court need not analyze whether plaintiffs can demonstrate "a causal connection between the union's wrongful conduct and their injuries." *Spellacy*, 156 F.3d at 126.

In their brief opposing summary judgment at page 83 and at oral argument, plaintiffs, for the first time, advanced another theory as to how defendants breached their duty of fair representation. They argued that defendants breached their DFR by telling plaintiffs prior to the arbitration proceeding that defendants were going to advocate that plaintiffs' flight time for MDA meant that plaintiffs had been recalled to the mainline and were no longer furloughed. Plaintiffs claim that, at the arbitration, defendants did not advocate this position, which left plaintiffs at the bottom of the integrated seniority list among all the furloughed pilots who had never flown for MDA. The Supplemental Complaint, however, is devoid of any mention of representations ALPA made to plaintiffs regarding their furlough status and how ALPA would advocate at the mediation and arbitration in light of plaintiffs' acceptance of positions to fly for MDA. A breach based on these allegations, which are not alleged anywhere in plaintiffs' Supplemental Complaint, will not be considered. *See, e.g. Reed v. Medford Fire Dept., Inc.*, 806 F. Supp.2d 594, 607 (E.D.N.Y. 2011) (The court "does not need to address claims raised for the first time on a motion for summary judgment . . . ."). Moreover, plaintiffs' new argument is essentially an attempt to resurrect issues that were previously dismissed by this court as untimely.

-19-

## CONCLUSION

For the reasons set forth above, defendants did not breach their duty of fair representation. Summary judgment is granted to the defendants, and plaintiffs' Supplemental Complaint is dismissed.  The Clerk of Court is directed to enter judgment for the defendants.

SO ORDERED.


electronic signature/ NG
_____
NINA GERSHON
United States District Judge


Dated:        Brooklyn, New York
              April 10, 2012